**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal Case NO. 26-cr-84 (RC)** |
| | : | |
| **ANDREW WALTER JACOBSON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. The defendant, Andrew Walter Jacobson, has pleaded guilty to Coercion and Enticement of a Child, in violation of 18 U.S.C. § 2422(b). For the reasons set forth below, the United States recommends a sentence of 360 months of incarceration, followed by 10 years of supervised release. The United States further requests that the defendant be ordered to register as a sex offender, consistent with the requirements under the law, which includes a requirement to register for 25 years pursuant to the Sex Offender Registration and Notification Act, 18 U.S.C. § 2250, 34 U.S.C. § 20911(3), and 20915(a)(2).

## FACTUAL AND PROCEDURAL BACKGROUND

On April 24, 2026, the defendant pleaded guilty to one count of Coercion and Enticement of a Child, namely MV1.

On at least three occasions between October 1, 2025, and January 31, 2026, Mr. Jacobson, who was 25 years old during the relevant time period, traveled from Maryland to Washington, D.C. to engage in sexual acts with MV1, a child who was only 14 years of age throughout the time

of the conduct described in the Statement of Offense and who resides in the District of Columbia. Mr. Jacobson knew that MV1 was fourteen years old. On a fourth occasion on or around January 31, 2026, Mr. Jacobson met MV1 at a friend's house in Maryland and picked her up, drove her back to his house in Maryland, and engaged in penetrative vaginal sex. Mr. Jacobson filmed the penetrative vaginal sex with MV1 on a cell phone.

More specifically, MV1 and Mr. Jacobson met sometime in or around October 2025 through a messaging application called Hush. They continued their conversation on Instagram and other messaging applications. Mr. Jacobson used the Instagram handle, "AND1_30_" and the discord handle "and140."

On the first occasion in October 2025, Mr. Jacobson drove his vehicle from Maryland to Washington, D.C. and parked his car in an alleyway behind MV1's home. MV1 came out of the home and met Mr. Jacobson in his vehicle. They talked and eventually, MV1 and Mr. Jacobson engaged in oral sex where Mr. Jacobson penetrated MV1's mouth with his penis.

On at least two separate occasions after the first sexual interaction in October 2025 and before January 31, 2026, Mr. Jacobson drove again from Maryland to Washington, D.C. to meet up with MV1 and engage in sexual acts. Specifically, on these two occasions in Washington, D.C., Mr. Jacobson drove to the alleyway behind MV1's home in Washington, D.C. and MV1 met Mr. Jacobson in his vehicle. On these two occasions, Mr. Jacobson engaged in vaginal sex with MV1, penetrating her vulva with his penis. At least one of these occasions was on or around January 10, 2026, where Mr. Jacobson was sharing his location with MV1 as he was driving from Maryland to Washington, D.C.

In addition to times described above, Mr. Jacobson and MV1 engaged in sexual acts at Mr. Jacobson's home in Maryland on January 31, 2026. Mr. Jacobson and MV1 spoke about MV1

arranging to travel from her home in Washington, D.C. to a friend's house in Maryland with the intent of Mr. Jacobson picking her up from there and taking her to his home in Maryland. Ultimately, MV1 did arrange to go to a friend's house in Maryland and Mr. Jacobson picked her up from that home in his vehicle to drive MV1 to his home. At Mr. Jacobson's Maryland residence, among other sexual acts, Mr. Jacobson penetrated MV1's vulva with his penis. Mr. Jacobson recorded a 45-second video of Mr. Jacobson penetrating MV1's vulva. The video depicts Mr. Jacobson penetrating MV1's vagina from behind her with his erect penis while wearing a condom.

*Discord Chats Between Mr. Jacobson and MV1*

Mr. Jacobson and MV1 communicated via Discord chat. On January 6, 2026, they engaged in a conversation where MV1 and Mr. Jacobson were discussing a video of MV1 engaging in masturbation. Mr. Jacobson wrote "sent iitttt" and MV1 indicated she was trying. MV1 wrote to Mr. Jacobson, "you've already seen most of it anyways. Idk if it's gonna work." Mr. Jacobson told MV1, after receiving and viewing the video of MV1 masturbating, "You can sell it tbh omg. Dead serious." Mr. Jacobson later advised that he could help sell the video for MV1, stating, "On hush I can be like yo 14 f selling. Something like that."

*Instagram Chats Between Mr. Jacobson and MV1*

Between January 4, 2026, and February 1, 2026, Mr. Jacobson and MV1 engaged in numerous conversations through Instagram. Below are excerpts from those communications:

*January 4, 2026*
JACOBSON: Do you want to goon
MV1: bro. no. gn
JACOBSON: It was just a question gn
MV1: but I feel like you can tell im already upset
JACOBSON: Can't. You're always short so
MV1: sigh. okay

JACOBSON: Am I wrong?!
MV1: yes. very. But we cant all be right so its okay

[*conversation continued*]

*January 7, 2026*
MV1: I miss 8th grade so much. It was peak
JACOBSON: That's so crazy you're a freshman lol
MV1: WHY. I know. I'm getting old.
JACOBSON: Cus I love Halloween
MV1: im gonna be 18 in 3 and 1/2 years.
JACOBSON: Can I tell you something
MV1: what
JACOBSON: I miss you
MV1: what do you mean
JACOBSON: Seriously?! I feel old. What do u mean what do I mean
MV1: like what do you mean you miss me. Like you wanna goon.
MV1: by that time youll be 1 year away from 30
JACOBSON: I mean yeah I'd like to but idk if you want to
JACOBSON: Being 30 is crazy
MV1: I cant. Its my bed time
JACOBSON: That's ok :). Not even real quick?
MV1: sigh. not for you.
JACOBSON: lol what do you mean not for me
MV1: like not for you. You aren't deserving
JACOBSON: Oohh ok that's fair if that's how you feel I'll respect it.

[*conversation continues]*

MV1: Im such a fat fucking chud
JACOBSON: Don't say that. You aren't
MV1: that's never happened to me
JACOBSON: Your body is lowkey perfect. I miss it. I lowkey need you.
MV1: thanks but not necessarily. I don't even know how you got me to take my pants off.
JACOBSON: It is really nice.
MV1: idk who I was feeling like. Then come over this weekend.
JACOBSON: I think of that night a lot. You sitting on it was amazing. Ok I will
MV1: really? Wait don't get my hopes up
JACOBSON: Yes really it felt amazing

[*conversation continued*]

JACOBSON: Do you want to goon. I wish you would be able to come here.
MV1: no. same. but only one can dream.

JACOBSON: Dang not that emoji. What are the chances we can stay at a hotel. Not even if I send some pics. (sends attachment of explicit picture of self).
MV1: Do you have discord?
JACOBSON. (sends second attachment of explicit picture of self). I do. Why.
MV1: so I can send you something. it only works on discord and messages.
JACOBSON: [provides discord]

[*conversation continues*]

MV1: Whoops. I think I didn't turn off sound. Sorry.
JACOBSON: I'm coming this weekend omg. It's totally ok don't turn off sound [sends an attachment]
MV1: sent an attachment. Yummy. Okay lol.
JACOBSON: I'm obsessed. Lowkey. Is that bad.

[*conversation continues*]

JACOBSON: Let me whisper "I love you" while I'm deep inside you.
JACOBSON: Or I can whisper "I love being deep inside you."
MV1: youre trying to make me attached to you. Kill me.
JACOBSON: Wouldn't it be hot af though.
MV1: year it would
JACOBSON: Yeah it so would. Let's record next time?
MV1: if it happens
JACOBSON: It will. Friday. So yes?
MV1: yes
JACOBSON: Good girl. I miss being inside you so much. Like seriously. Should I go raw inside you?

[*conversation continues*]

JACOBSON: I have a question. How rough can I be with you?

[*conversation continues*]

MV1: really rough.
JACOBSON: Are you sure?
MV1: yeah very sure.
JACOBSON: I'm into choking slapping and shoving my fingers in your mouth while you look at me. Where can I slap you.
MV1: - sent an attachment. Wherever. Perfect.
JACOBSON: Can I slap your face.
MV1: yeah
JACOBSON: Then shove my fingers in your mouth.
MV1: mhm daddy
JACOBSON: What if I want to spit in your mouth.
MV1: then do it.

JACOBSON: Fuck yeah I'm obsessed. I want to slap your face and open your mouth with my fingers and spit in your mouth while you're moaning as I'm deep inside you. Watch you swallow.
MV1: that's exactly what I want
JACOBSON: Wait really.
MV1: yeah. Really. It seems hot to me.
JACOBSON: Fuck.. you're perfect.
MV1: idk why
JACOBSON: I'll fuck your [*sic*] so hard. I want to choke you while I'm fucking you hard. Watching you moan so loud and I'll spit in your mouth. Then before I cum I'll pull my dick and make you catch it in your mouth.
MV1: youre getting me really excited lol.
JACOBSON: Will you swallow my cum this time.
MV1: I hope so.
JACOBSON: Would u actually want to keep some in a bag.
MV1: we can do that
JACOBSON: Ok what would you do with it.
MV1: I can swallow some every day.
JACOBSON: Good. . I want you to record and send it to me.
MV1: okay I can do that.
JACOBSON: Thank you princess. Can I slip a finger in your ass.
MV1: mmm idk. To be determined.
JACOBSON: Should I just do it without asking.

[*conversation continues*]

JACOBSON: I want to be rough and dirty
MV1: please do be rough
JACOBSON: I want to so bad .. You have no idea. I want you to choke on my dick.
MV1: I can't wait. But I have to go to sleep.
JACOBSON: Will you deepthroat me.
MV1: yeah.
JACOBSON: Want to help me cum real quick
MV1: how
JACOBSON: I just want to see your ass.
MV1: I cant
JACOBSON: Ok can I see your wet pussy
MV1: [sends photo of herself]. This is the best I can do. K.
JACOBSON: Thank you princess.

[*conversation continues*]

*January 9, 2026*
MV1: yoo. I found this guy that's willing to pay for me to giv him head but is that too low??
JACOBSON: No wtf!!! Girl do it! Get that money wtf
MV1: idk. I also haven't told him how old I am so idk if it's gone happen. Idk if I will

JACOBSON: He's gonna be ok with it either way. How did you meet him
MV1: this is my friends friend. But and old friend. Idk. It feels like im losing more and more respect for myself. Idk if im gonna do it.

[*conversation continues*]

MV1: he was like would you be down to give me head for some cash. And I was like hell yeah.
JACOBSON: Niceee. You should. He's around here?

[*conversation continues*]

JACOBSON: I'm going to destroy you. Your ass is perfect. Baby. I want to lay in a bed with you and slip it in.
MV1: is it the best ass you've ever seen. Jk. That would feel so good.
JACOBSON: It lowkey is. Imagine it slipping inside you while we cuttle and watch tv.
MV1: lol. a good dream.
JACOBSON: What if we stay in a hotel.
MV1: mmm maybe.
JACOBSON: Think you could convince your mom.
MV1: I just have to lie. But idk what the lie would be.
JACOBSON: Do you have a dance coming up.
MV1: I could say im at my friends house. Nah
JACOBSON: Maybe you can be like oh me and some friends are staying the night in a hotel after the dance lol. Awe shit. Oh ok that would be perfect. What about your location.
MV1: I can change it to my ipad. And leave it at her house.
JACOBSON: OK perfect we can do that. When?

[*conversation continues*]

JACOBSON: But I can do a lot more in a bed than a damn car. And we can record all of it. I can destroy you. Are you gooning.
MV1: Nah.
JACOBSON: Do you want to.

[*conversation continues*]

*January 19, 2026*
JACOBSON: Babe. You are so fucking tight.
MV1: was it good last time? Ik the head was. But the other part
JACOBSON: It was just uncomfortable. But it felt amazing. Small ass car.
MV1: oh sorry
JACOBSON: Not your fault just shitty car. Maybe we just do it outside the car lol. [sent attachment]. Babe. Are you still up.
MV1: sent an attachment.
JACOBSON: I love being inside you. I'm addicted.
MV1: not addicted enough.
JACOBSON: What do you mean.

MV1: nothing
JACOBSON: Nah fuck that I'll prove you wrong. Next weekend you're staying with me.
MV1: uh to be determined.

[*conversation continues*]

JACOBSON: Omg babe. When you first sucked it and then I slid in without condom. What did you think?

[*conversation continues*]

JACOBSON: I love how sloppy you made it. That turned me on.
MV1: lol I tried. I took ur advice.
JACOBSON: Babe. I want to cum inside you. Good girl.
MV1: well you would have to do that on the off season. The very off season.
JACOBSON: Yes yes ik baby.
MV1: maybe you could do that with a condom on.
JACOBSON: Yeah with a condom on. Or I can just cum in your mouth again. But this time I want you to open your mouth.
MV1: oh okay. I can do that.
JACOBSON: And stick out your tongue.
MV1: and next time I want you to eat it. I got you.
JACOBSON: I'll do that baby.
MV1: but I might punk out.
JACOBSON: Want me to force it on you.

[*conversation continues*]

JACOBSON: What are the chances you get on birth control.
MV1: low
JACOBSON: Damn it
MV1: I could say I have bad cramps. But I don't.
JACOBSON: I don't want to use a condom with you anymore.
MV1: and idk how the whole process works. I can ask my friend.
JACOBSON: OK ok please do.
MV1: lol okay i'll ask tomorrow.
JACOBSON: Thank you baby. I want to fuck your raw but I'm still pulling out.

[*conversation continues*]

JACOBSON: I want to slap you and shove my fingers in your mouth and spit in your mouth while you moan and my dick is deep inside you.

[*conversation continues*]

JACOBSON: You want me to choke you too??

MV1: yeahh
JACOBSON: Are you sure.
MV1: u did good last time. Im sure
JACOBSON: I can slap your face?
MV1: yeah
JACOBSON: And spit in your mouth? Can I shove my dick down your throat.
MV1: yeppp. Of course lol
JACOBSON: ok good.

[*conversation continues*]

JACOBSON: Are you stil gooning
MV1: yeah
JACOBSON: can I see. I am too
MV1: sent an attachment
JACOBSON: Fuck I love you. [Sent an attachment]
MV1: lol
JACOBSON: Want me to cum
MV1: Yeah
JACOBSON: One condition. Well 2
MV1: What are they??
JACOBSON: 1. Tell me you love me and 2. 1 last video

[*conversation continues*]

*January 31, 2026*
JACOBSON: Do you like the video
MV1: [sends video of MV1 and Mr. Jacobson having vaginal sex]. Its okay. Too much of me. Not enough of you yk.
JACOBSON: Yes that's what I liked lol. Yeah next time you should record.
MV1: how would I record
JACOBSON: lol selfie mode and then just record.
MV1: smart. I wish I could've sucked it.
JACOBSON: I was gonna sk if you wanted to on the ride back but then the phone call and shit. Can I tell you something.
MV1: yeah
JACOBSON: Your body looked amazing yesterday.

[*conversation continues*]

*February 1, 2026*
MV1: Can you send me the video
JACOBSON: [sends video of MV1 and Mr. Jacobson engaging in vaginal sex to MV1]. I should've moved your hair omg.
MV1: yeah you really should've. Thanks.
JACOBSON: of course. Should I get a tripod for next time lol.

MV1: are we making porn videos.
JACOBSON: Do you want to

*Text Message Chats Between Mr. Jacobson and MV1*

In addition to discord and Instagram, MV1 and Mr. Jacobson also spoke via text message. There were text messages between Mr. Jacobson and MV1 sent between approximately 9:24 pm and 11:54 pm on January 30, 2026, just prior to the production of the video. The messages include Mr. Jacobson asking MV1 what she would like to drink and texting her, "Nah you don't have to but I feel like it would loosen you up a little." Mr. Jacobson then texts MV1, "Okayy well I can get Seagrams which is very low alcohol we can get that or smirnoffs which is higher but good af." Mr. Jacobson also texts MV1, "I wanna watch Netflix and drink for a little and do a round or 2" and then indicates that he is eight minutes away.

Mr. Jacobson's sentencing is set for December 4, 2026.

## DISCUSSION AND RECOMMENDATION

### I. Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then

consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II. Sentencing Guidelines Calculation

The United States agrees with the Guidelines calculation set forth in the Presentence Report, estimating a final offense level of 42 and a Guidelines range of 360 months of incarceration up to life.

## III. United States' Sentencing Recommendation

The United States recommends a Guidelines sentence of 360 months of incarceration, to be followed by 10 years of supervised release, to run concurrent with the sex offense registration period. This sentence aligns with the sentencing factors outlined in 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, as well as to ensure a balance of justice to all individuals involved, and to provide the defendant with necessary rehabilitation measures.

## IV. The § 3553(a) Factors Support a Sentence of 360 Months of Incarceration.

### A. The Nature and Circumstances of the Offense

The defendant's conduct in the instant case, as delineated above, reflects a sustained effort to abuse a child. The relationship the defendant facilitated with MV1, who was a 9th grader, was more than sexual. As evidenced by their communications, the defendant successfully crafted a relationship characterized by a gross power imbalance, where as an adult more than ten years MV1's senior, the defendant made grotesque requests that MV1 acquiesced and submitted to. These included requests to choke MV1, spit in her mouth, and engage in sexual acts without a condom, potentially exposing MV-1 to sexually transmitted diseases or pregnancy. Things also reached the point where MV1 asked questions of the defendant about experiences she was understandably unfamiliar with and even vulnerably expressed that she was losing respect for herself, and instead of acting like a responsible adult in a position of trust, the defendant saw these questions as further opportunities for sexual gratification. The defendant tried to induce MV1 to use a ruse with her mother to obtain birth control so that he could engage in sexual acts with MV1 without a condom, to lie to her mother to engage in other sexual acts, and even to prostitute herself out online and in person, offering to sell videos of her on a social communication application.

The defendant used subterfuge to commit his crimes, which speaks to his willingness to evade law enforcement detection. He told MV1 that he wanted to have a sexual encounter with her in Maryland. In order to facilitate that encounter, the defendant told MV1 to come to her friend's home in Maryland. The defendant then picked her up from her friend's home and drove to his home, where he produced a video engaging in sexual acts with MV1.

That there was no physical force used to make MV1 act against her will does not make the defendant's coercion any less serious. In fact, the defendant's conduct exhibits a pattern known as "grooming" that is not uncommon to these types of cases:

> Grooming usually involves normalizing sexualized behavior in the offender-child relationship by introducing increasingly intimate physical contact by the offender toward the victim, very gradually sexualizing the contact, and sometimes using child pornography to break down the child's barriers. This gradual process and the relationship of trust and authority that the offender usually holds over the child, along with the child's immaturity and subservience, serves to break down the child's resistance. These children have a difficult time understanding what is happening to them and why and have very little control over their circumstances. U.S. Department of Justice, National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress (Aug. 2010), at 21.
>
> Grooming typically begins with the selection of a child who exhibits desired behaviors or psychological characteristics such as low self-esteem or family problems. *Id.* at 30.

The defendant's choice to victimize MV1 will cast a long shadow over MV1's life, affecting her in ways that may not manifest for several years. The sexual exploitation of a child is defined as a crime of violence, reflecting the reality that many child sexual abuse victims experience the same long-term trauma as victims of other types of violence, even when their bodies do not bear any visible scars. 18 U.S.C. § 3156(a)(4)(c). While the full extent of the damage suffered by MV1 is unknown, she will likely bear the consequences of the defendant's abuse for years to come. In its 2019 Report to Congress on Sexual Abuse Prevention, the CDC found that "Short- and long-term physical health consequences of CSA may include unwanted/unplanned pregnancies, physical injuries, and chronic health conditions such as heart disease, obesity, and cancer, among others. Short- and long-term mental health consequences may include depression, posttraumatic stress disorder (PTSD), substance abuse, and risky sexual behaviors, among others. In addition, the odds of attempting suicide in their lifetime is six times higher for men and nine times higher for women with CSA histories when compared to individuals without a history of

CSA. Adults who have experienced CSA also report decreased health-related quality of life, and nearly half are sexually revictimized in adulthood."

Other academic studies suggest that early trauma, including sexual abuse, may interfere with brain development, and can produce various neuropsychiatric symptoms commonly associated with drug use. *See* Anderson, C. M., Teicher, M. H., Polcari, A., & Renshaw, P. F. (2002): Abnormal T2 relaxation time in the cerebellar vermis of adults sexually abused in childhood: Potential role of the vermis in stress-enhanced risk for drug abuse. *Psychoneuroendocrinology, 27*, 231-244; Baynard, V. L., Williams, L. M., & Siegel, J. A. (2001): The long-term mental health consequences of child sexual abuse: An exploratory study of the impact of multiple traumas in a sample of women. *Journal of Traumatic Stress, 14*(4), 697-715 (noting that child sexual abuse victims reported a lifetime history of more exposure to various traumas and higher levels of mental health symptoms). Other studies have found that individuals who suffer sexual abuse in their childhood years have a higher rate of anxiety, disruptive behaviors, substance abuse, and personality disorders compared to others who may have experienced other forms of abuse or neglect. *See* Cohen, P., Brown, J., & Smailes, E. (2001): Child abuse and neglect and the development of mental disorders in the general population. *Development and Psychopathology, 13*, 981-999; Dube, S. R., Anda, R. F., Felitti, V. J., Chapman, D. P., Williamson, D. F., & Giles, W.H. (2001): Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from the adverse childhood experiences study. *JAMA, 286*(24), 3089-3096 (noting that a powerful relationship exists between adverse childhood experiences and risk of attempted suicide through the life span); Merrill, L. L., Thomsen, C. J., Sinclair, B. B., Gold, S. R., & Milner, J. S. (2001): Predicting the impact of child sexual abuse on women: The role of abuse severity, parental support, and coping strategies.

*Journal of Consulting and Clinical Psychology, 69*(6), 992-1006 (child sexual abuse is a significant predictor of long-term psychological difficulties ranging from depression and anxiety to sexual problems and dissociative symptomatology). Research also indicates that sexually abused adolescents are at an increased arrest rate for sex crimes and prostitution, and they are at an increased risk for earlier pregnancy. *See* Putnam, F. W. (2003): Ten-year research update review: Child sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry, 42*(3).

Additionally, survivors of childhood sexual abuse often experience intense feelings of guilt and shame that can affect their capacity to develop meaningful present and future relationships and can result in more guarded and cautious interactions with peers and other adults. *See* Raymond E. Webster, Symptoms and Long-Term Outcomes for Children Who Have Been Sexually Assaulted, 38 Psych. in the Schools 533, 536–39 (2001). These children often develop symptoms associated with post-traumatic stress disorder (PTSD), including general agitation, behavior disorganization, and frightening nightmares. *Id.* at 537. Children who are particularly young or rely on the perpetrator for things like emotional support can suffer particularly severe trauma that intensifies their fears, causes emotional confusion, and impedes their ability to trust others. *See id.* at 538–39. This is even more of a salient concern in the instant case because the defendant manipulated MV1 emotionally to establish a relationship of trust such that he could take advantage of her. Such damage might be irreparable: Even with a strong family support structure, the trauma of abuse can also "overwhelm" even "an essentially healthy functioning child who resides in a reasonably well-functioning home because [it] can disrupt the primary protective factors (such as friends, caretakers, extended family, familiar neighborhood) that protected the child initially." Webster, Symptoms and Long-Term Outcomes, at 540.

Such conduct will invariably leave a lasting imprint on MV1, but it also had the potential to carry consequences much graver if the defendant had not been stopped. It is presently unknown whether the defendant indeed disseminated MV1's child sexual abuse material online, but even assuming arguendo that he did not, the defendant's requests to do so and desire to make multiple films of the sexual abuse of MV1 posed a serious risk to MV1 and children writ large. The defendant's attempt to introduce MV1 to the dark, online world of CSAM occurs in the context of him seeking to exploit MV1 to other like-minded individuals for monetary profit, or arguably worse, in furtherance of his own sexual gratification and that of others. Such conduct actively sustains and perpetuates the market and online community for CSAM, much of which depicts the predatory exploitation of minor children like MV1.

The trafficking, dissemination, and consuming of CSAM has a real-world effect on the safety and wellbeing of children, both because of the immense psychological toll on the child whose abuse is forever frozen online and the contribution to the sexual abuse and production of that sexual abuse of new victims. The defendant chose to produce CSAM of himself engaging in sexual acts with MV1, disregarding the impact to MV1 of both the initial abuse and the long-lasting effects capturing that abuse on camera could mean for her. As the D.C. Circuit has recognized, "[c]hild pornography stored online can be distributed worldwide almost instantaneously." *United States v. Park*, 938 F.3d 354, 365 (D.C. Cir. 2019) (citing *United States v. Sullivan*, 451 F.3d 884, 891 (D.C. Cir. 2006)). The United States is especially concerned by the lengths to which the defendant went in committing these acts, from driving across state lines to concocting a plan to avoid the scrutiny of MV1's parents. These acts evince both eagerness and calculation on the defendant's part in facilitating the exploitation of MV1.

The defendant has left MV1 carrying the devastating and lifelong consequences of his actions. The nature and circumstances of the defendant's crimes therefore justify and necessitate a guideline compliant sentence of 360 months of incarceration followed by 10 years of supervised release.

**B. History and Characteristics of the Defendant**

The defendant took responsibility for his actions early in the case, which shows a willingness to acknowledge his own wrongdoing and at least some degree of insight into his actions. The defendant also has no prior convictions.

While these factors should be considered and should inform the type of treatment and intervention the defendant should be prescribed while incarcerated and on supervised release, they should not and do not detract from the seriousness of the defendant's conduct and the lifelong harm his conduct will inflict on MV1. The United States respectfully contends that these considerations do not give rise to a downward departure from the guidelines as they are already considered in the guidelines, both in the credit received for acceptance of responsibility and in the criminal history category.

Defendant's behavior demonstrates a pattern of sexual engagement with a child – not a onetime act or error in judgement. Moreover, the language he uses and manipulation he engages in shows that Defendant wasn't just a passive participant, but actively working to groom his victim. At the time of his conduct, the defendant was *eleven years older* than the victim and discussed how the victim missed being in 8th grade the prior year. The defendant was well-aware of the victim's youth and vulnerability and chose to exploit her for his sexual gratification. He further encouraged her to engage in sexual acts with other individuals.

Also of note is the defendant's steady career in the Navy. While that may speak to the defendant's character and ability to be a functioning member of the community in a positive light, it is actually the exigence for further concern on the United States' part. Members of the armed services are charged with an all-too-important task, and as such, occupy a position with unique access to the community where their conduct should exemplify the best of society. That is far from what happened in the instant case. Instead of acting in the best interests of MV1, he chose to use her for his gratification and as an object for sadistic sexual play.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense**

The United States' recommended sentence in this case would promote respect for the law and provide just punishment for the defendant's offenses. 18 U.S.C. § 3553(a)(2)(A). As the Eleventh Circuit explained in *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010):

> This purpose--essentially the "just des[s]erts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

Child sex abuse offenses, especially in combination with child pornography offenses, are extremely serious because they result in perpetual harm to the most vulnerable victims, while simultaneously validating and normalizing the sexual exploitation of children. Courts across the country have recognized this:

> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their

actions were discovered by law enforcement. *United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).[1]

When enacting mandatory minimum penalties for those who participate in the sexual abuse and exploitation of children, Congress similarly described the evils of such acts:

> [T]he sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children. Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3027 (1996).

The degree of moral turpitude in grooming a child in order to sexually take advantage of her, doing so, and forever memorializing that abuse with a camera is almost ineffable. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

As described above, the sexual abuse and exploitation of children are offenses that have lifelong, devastating consequences for the victims. The United States' proposed sentence would provide just punishment for these offenses, promote respect for child sexual abuse and exploitation

[1] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

laws, and reflect the seriousness of the defendant's offense and offenses against minor victims in general.

**D. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant and Afford Adequate Deterrence**

In passing the "Preventing Child Sex Abuse Act of 2023," Congress noted the following:

> According to the Rape, Abuse & Incest National Network, an individual in the United States is sexually assaulted every 68 seconds. And every 9 minutes, that victim is a child. Meanwhile, only 25 out of every 1,000 perpetrators will end up in prison.…The criminal justice system should and has acted as an important line of defense to protect children and hold perpetrators accountable. It is the duty of Congress to provide clearer guidance to ensure that those who commit crimes against children are prosecuted to the fullest extent of the law. Preventing Child Sex Abuse Act of 2023, Pub.L. No. 118-31, § 5102, 137 Stat. 933, 933 (2023).

The type of offense that the defendant pleaded guilty to continues to present a grave public safety risk, and as noted by Congress, the importance of strongly enforcing the laws governing such conduct cannot be understated. It is extremely difficult to detect these crimes because of the unique vulnerability of child victims from both their lack of awareness of what happened and any reluctance to report because of a perceived relationship with the offender. The defendant's conduct, as explained above, also serves to perpetuate the market for CSAM, which is a gateway to and aids the proliferation of child exploitation in society writ large.

In fact, several cases in this district support the proposition that a widening of the CSAM universe is linked to a greater prevalence of hands-on abuse. *United States v. Allen Love*, 07-cr-27 (RBW) (in 2007, the defendant was sentenced for transportation of child pornography for distributing CSAM to an undercover agent and subsequently violated supervised release in 2024 for contacting minors to meet them for sex); *United States v. Charles Hilton*, 24-cr-554 (ACR) (defendant, who was previously convicted of endangering the welfare of a child, was sentenced in 2025 for uploading CSAM of a minor child he abused in addition to large quantities of CSAM he

found on the internet); *United States v. Linwood Barnhill*, 25-cr-149 (JMC) (defendant, who was previously convicted of possession of child pornography and pandering, was sentenced in 2026 for sex trafficking minors). Because of the inextricable link between CSAM offenders and offenders who engage in hands-on abuse, even the possession, much less the production, of a single picture of CSAM poses a serious risk of danger to children in the real world.

This concern is particularly relevant here where the nature of the CSAM, in addition to its mere existence, further serves to sustain the market for child exploitation.

> While some of these images clearly depict children in great distress, others depict the children as appearing compliant. The abuse is rarely a one-time event, but rather an ongoing victimization that can last and progress for many years. The offender usually takes great care to groom the child so the sexual behavior becomes normalized. Additionally, because the abuser is typically a person the child trusts, it is easier to convince the child to agree to sexual acts….It is important to note that depictions showing a so-called "compliant child" also provide collectors of child pornography support for their delusion that the child is not suffering abuse, a conclusion that lets them rationalize their collection of images and brings them potentially closer to contact abuse themselves. U.S. Department of Justice, National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress (Aug. 2010), at 21.

Congress, the Supreme Court, and the Sentencing Commission have accordingly indicated that general deterrence is a very important factor when considering an appropriate sentence in child exploitation cases. As the Sixth Circuit Court of Appeals explained:

> [A] focus on [individual] recidivism ignores the deterrent effect that punishment may have on *other* potential offenders, a goal that could be considered even more important than deterring future criminality by [the defendant] alone. *United States v. Goodin*, 815 F. App'x 860, 864 (6th Cir. 2020).

The United States' sentencing recommendation takes into the account that the defendant presents a risk of reoffending if he should ever be released. This is consistent with the fact that sex offenders have a high rate of recidivism generally. *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported

by substantial authority (citing *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *United States v. Irey,* 612 F.3d 1160, 1214 (11th Cir.2010) ("[T]he threat of recidivism by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.")).

Given the defendant's risk of reoffending, the United States' recommended sentence is necessary to protect the public from further crimes of this defendant. The sexual exploitation of children presents a serious danger to the community, resulting in severe mental, emotional, and physical trauma to the children who are victimized. This sentence would go far in ensuring that no child is ever again victimized by the defendant.

The defendant stands before this Court as someone who created original images of child sexual abuse material depicting his abuse of MV1, whom he groomed in order to take advantage of. Moreover, the defendant encouraged the potential sale of CSAM of MV1 online for profit and the prostituting of MV1 for money. These are serious crimes, and the Court should consider the role general deterrence for likeminded offenders—those who have a sexual interest in children and must make the choice of whether they will act on that interest—when fashioning a sentence.

### E. The Applicable Sentencing Guidelines Range and the Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between [] defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G2.1 with a final offense level of 42 and Criminal History Category I was 300 months during Fiscal Years 2021—2025. The median sentence length was also 300 months.

A sentence of 30 years of incarceration is justified and appropriate here where the defendant's Sentencing Guidelines range is 30 years to life. Additionally, such a sentence would not be inconsistent with the national median length of imprisonment and the national average length of imprisonment imposed in cases during the last fiscal year whose primary guideline was §2G2.1.

These national statistics indicate that courts around the country are imposing sentences consistent with the United States' request in this case.

Following the United States' request would not create sentencing disparity.

## V. The United States' Restitution Request

The United States will submit a separate filing including restitution requests on behalf of any known victims who have requested restitution in this matter.

## CONCLUSION

The United States submits that a sentence of 360 months of incarceration, followed by 10 years of supervised release,[2] is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

/s/
Richard S. Kelley
Assistant United States Attorney

[2] As part of the sentence, the United States is also requesting that the defendant be ordered to register as a sex offender, consistent with the requirements under the law, which includes a requirement to register for 25 years pursuant to the Sex Offender Registration and Notification Act, 18 U.S.C. § 2250, 34 U.S.C. §§ 20911(3), and 20915(a)(2).